(No. 14232.—Reversed and remanded.)

JULIA KINCAID SELLERS, Appellee, vs. HARRY O. KIN-
CAID et al. Appellants.

*Opinion filed April 19, 1922—Rehearing denied June 8, 1922.*

1. WILLS—*when decree holding that a will is a forgery will be
set aside.* A decree entered on the verdict of a jury finding a will
to be a forgery will be set aside by the Supreme Court where it
clearly appears from an examination of the original exhibits in
the record that the signature to the instrument is genuine, and
there is no evidence tending to show any motive on the part of
the attesting witnesses to forge the will or to testify falsely as to
its genuineness.

2. SAME—*burden is on proponent to prove the will in case of
contest.* While the burden of proof, in the sense of producing evi-
dence, passes from party to party as a case progresses, the bur-
den of proof, in the sense of the obligation to establish the truth
of the claim by a preponderance of the evidence, rests throughout
upon the party asserting the affirmative of the issue, and in a suit
to contest a will the burden is on the proponent to prove the will.

APPEAL from the Circuit Court of Massac county; the
Hon. D. T. HARTWELL, Judge, presiding.

JOHN W. BROWNING, and H. A. EVANS, (FRED R.
YOUNG, of counsel,) for appellants.

COURTNEY, HELM & HELM, (S. B. KERR, and J. G.
HARLEY, of counsel,) for appellee.

Mr. CHIEF JUSTICE STONE delivered the opinion of the
court:

This is a will contest. Appellee, Julia Kincaid Sellers,
filed her bill in the circuit court of Massac county contest-
ing the will of Robert E. Kincaid, her brother. By the
bill as amended the only ground of contest is that Kincaid
did not sign the will,—in other words, that the purported
will is a forgery. By the terms of the will the testator,
after directing that his debts and funeral expenses be paid,
bequeathed to appellee the sum of $5; to his brother John

$500; to his brother James $5; to his nephew, Roy M. Kincaid, son of James, the residue of his personal property, and to Roy and his brother, Harry, he devised all real estate owned by him at the time of his death.

The testator died on March 22, 1919, at the age of about thirty-five years. He had never married. At the time of his death he owned a large amount of land and considerable personal property. His only heirs-at-law were his two brothers, James and John, and his sister, Julia, the appellee. The record shows that the testator was addicted to the excessive use of intoxicating liquor; that in the later years of his life he spent most of his time in the cities of Metropolis, in Massac county, and Paducah, Kentucky, just across the Ohio river; that about July 1, 1918, he was seriously injured in a street car accident in Paducah, resulting in some broken ribs and other injuries; that for a number of weeks thereafter he was disabled by such injuries and for a considerable time walked with a cane. The uncontroverted evidence also shows that by reason of the testator's excessive use of intoxicants appellee and her brother James caused a petition to be filed in the county court of Massac county seeking the appointment of a conservator for him on the ground that he was a drunkard and a spendthrift. He contested this petition, and on a hearing the jury found he was not incapable of managing his own estate and the petition for the appointment of a conservator was denied. He thereafter gave expression to a feeling of bitterness toward his sister and his brother Jim, and also indicated ill-will toward his brother John, who, though he took no part in the conservatorship proceedings, did nothing to assist him in the matter. It is undisputed that Harry and Roy Kincaid, young men about twenty-three and twenty-one years old, were on very friendly terms with the testator and stood by him in his troubles notwithstanding the interest of their father in the matter. Numerous statements were made by the testator in his lifetime

showing an affection for the two young men. The evidence shows that he had stated to different of his friends, at numerous times, that he intended to leave his property to his nephews, Harry and Roy, and that his brothers and sister would get nothing that he was not compelled to give them. It appears that in the spring of 1918 he consulted an attorney in Paducah concerning his right to will his property to his nephews.

The proof of the proponents of the will is, that on July 22, 1918, the testator went to the office of Crossland & Crossland, attorneys at Paducah, and employed them to bring a suit for damages against the Paducah Traction Company for the injuries he had sustained in the street car accident, and that he on that occasion signed a contract stipulating their employment and fee; that at this time Samuel Crossland, the senior member of the firm, was in the office; that later in the same day, some time between four and six o'clock, the testator again appeared at the office of Crossland & Crossland in company with G. A. Chandler, of Paducah, a close friend, who conducted a saloon in that city, and requested the junior member of the firm, C. B. Crossland, who was at that time present, to write his will; that the will was written in accordance with his directions and was witnessed by Crossland and Chandler; that the testator took the will away with him on the day it was executed but some time thereafter brought it back and requested Crossland to keep it for him; that upon learning of the death of the testator, Crossland requested Chandler to notify the nephews that he had the will, as he was not acquainted with them. It appears that one of these nephews secured the will from Crossland and had it probated in the county court of Massac county on the 5th day of May, 1919, and on the 4th day of May, 1920, the bill in this case was filed.

Proponents proved by C. B. Crossland and Chandler, who witnessed the will, that they saw the testator sign it;

that the information concerning the terms of the will was all procured from him. They also proved by Samuel Crossland the execution of the contract made earlier in the day, and it was offered in evidence for the purpose of comparing the signature thereon with that appearing on the will. For this purpose certain checks, notes and other documents were also put in evidence by proponents. The originals of these exhibits, together with like exhibits offered by contestant, have been certified to this court for examination and comparison. Proponents also offered the testimony of sixteen witnesses, neighbors, friends and acquaintances of the testator, who testified as to their acquaintance and business transactions with him, and also as to the signature on the will or to statements of the deceased concerning the disposition of his property, some testifying concerning both matters. In opposition to this, contestant offered the testimony of five witnesses as experts in handwriting, who stated that in their opinion the signature "Robert E. Kincaid" to the will was not in the handwriting of Kincaid. She also offered evidence tending to impeach the reputation of the witnesses Crossland and Chandler for truth and veracity, and offered the testimony of Dr. Miller, a physician in Metropolis, who testified that the testator came to his office in Metropolis at about two o'clock in the afternoon of July 22, 1918, the day on which the will purports to have been executed in Paducah. Dr. Miller testified that Kincaid was under the influence of liquor on that day and very nervous, and that witness gave him a bottle of bromides, and a bottle was introduced in evidence bearing a label dated 7/22/18. Dr. Miller testified that as near as he could remember Kincaid remained at his office until about 3:30, when he went away, saying he was going home. Contestant also offered the evidence of three witnesses who stated that they saw Kincaid on an afternoon in the latter part of July in the city of Metropolis, though they do not state the day of the month; that he was intoxicated and

walking with a cane; that he went to the house where his sister lived when in Metropolis, but that she was not in the city at that time, having moved to Oklahoma and rented the house. These witnesses and two others testified to statements by the testator indicating that he was friendly toward his sister.

In considering whether Robert E. Kincaid signed this will the issues of fact may be divided into four branches or parts: (1) Veracity of the attesting witnesses; (2) possibility of Kincaid being in Paducah on the afternoon of July 22, 1918; (3) attitude of Kincaid toward his sister and brothers; and (4) the signature of Kincaid.

Concerning the first issue, contestant offered George L. Alliston, of Paducah, sheriff; George Dorris, of Paducah, day captain of the police department of that city; Thomas Stevens, a policeman; T. J. Harper, an insurance agent; J. C. Rule, a butcher, and John Mack, a carpenter, who testified that the reputation of C. B. Crossland and August Chandler for truth and veracity was bad. In opposition to this impeaching testimony the proponents offered the testimony of Frank N. Burns, State railway commissioner of Kentucky, former alderman and mayor of Paducah; W. A. Berry, practicing attorney of Paducah; John K. Hendricks, former congressman and State senator from the district of the city of Paducah; James M. Lang, of Paducah, county judge and former president of the board of education and mayor of that city; M. V. Eaton, of Paducah, attorney and former State senator from that district; H. M. Franklin, chief of police of the city of Paducah; Henry Bailey, city tax assessor and former city clerk and chief of police of Paducah; William M. Reed, judge of the circuit court of the second judicial district of Kentucky, and Jack E. Fisher, commonwealth's attorney for such district, all of whom testified that the reputation of C. B. Crossland and Chandler for truth and veracity was good. These witnesses testified to long years of ac-

quaintance with Crossland and Chandler. The record shows that Dorris, one of contestant's witnesses on this branch of the issue, was actively assisting contestant in securing evidence. From an examination of the entire record we are of the opinion that it does not show that Crossland and Chandler are unworthy of belief. If this were the only issue of fact we would not be inclined to disturb the verdict of the jury in this case, however, as they saw and heard the witnesses testify concerning that issue.

As to the second branch of the issue,—*i. e.,* whether or not Kincaid was in Paducah on the afternoon of July 22, 1918,—the testimony of Dr. Miller, for contestant, is that Kincaid was in his office between 2 :00 and 3 :30 P. M. on that day and that he left about the latter time. Dr. Miller does not attempt to fix the date on which the testator was in his office except by the memorandum on the bottle containing the prescription he gave him at his office. The record shows that the testator owned and operated an automobile. The distance between Metropolis and Paducah is shown to be about ten miles, and the two cities are connected by a roadway. There appears to be no reason why the testimony of Dr. Miller that the testator left his office about 3 :30 is not consistent with the testimony of Crossland and Chandler that he was at the office of Crossland & Crossland between four and six on that day. The other witnesses who saw him in Metropolis on an afternoon in the latter part of July, 1918, do not give the day of the month. We are of the opinion, therefore, that the testimony offered by the contestant does not necessarily controvert that offered by the proponents that the testator was in Paducah between four and six on the afternoon of July 22.

Concerning the third branch of the issue,—*i. e.,* his attitude toward his sister and brothers,—proponents offered twelve of the friends and acquaintances of the testator, who testified that Kincaid had made statements of his intention to will his property, or the bulk of it, to his two nephews.

Most of them testified to statements made by him showing ill-will toward his sister and brothers, especially James and appellee. On the other hand, contestant offered the testimony of five witnesses to the effect that Kincaid prior to July, 1918, and subsequent to the conservatorship proceedings, lived with his sister; that their relations were friendly; that on one occasion he went to Oklahoma with her. Five of the twelve witnesses for proponents testified to statements on the part of the deceased a few weeks before the will was made, that he expected to give his property to his nephews, Harry and Roy, and that he would not leave anything to his brothers and sister. Two of the twelve witnesses testified that similar statements were made within a few months of his death. The conservatorship proceedings against him were instituted in February, 1917, so it is evident, if these witnesses are to be believed, that the feeling which these proceedings naturally engendered in him toward those responsible for their being instituted continued to a greater or less degree up to the time of his death.

Coming now to a consideration of the fourth branch of the issue,—i. e., the proof as to the signature to the purported will, upon which appellee chiefly relies in defense of the verdict of the jury,—we find the testimony of five witnesses who qualified as experts stating that the signature to the will is not the signature of Kincaid, while eight of his friends and acquaintances, who testified that they were familiar with his signature, state that the signature to the will is that of Kincaid. The contestant's witness James M. Choat, on being shown a note and an escrow contract proven to have been signed by Kincaid, stated that in his opinion the signatures on those were in the same handwriting as that on the will. The contract which Samuel Crossland identifies as having been signed by Kincaid on July 22, 1918, is in evidence. Its execution and genuineness are not disputed and his signature to that contract must be taken as genuine. Numerous other instruments were offered by

both proponents and contestant for comparison, bearing signatures admittedly those of Kincaid. As these have all been certified for examination on review, this court is not in the same position with reference to them as it is regarding the testimony of witnesses heard before the jury but is in as good a position as was the jury to decide on a matter of comparison.

The evidence in the record shows that Kincaid, on the day the will purports to have been executed, was nervous, doubtless due to his recent injury and to his use of intoxicants. It also shows that he was more nervous at some times than at others. It is also a matter of common knowledge that one recovering from prolonged intoxication is apt to be in a nervous condition. While there is considerable variance in the signatures on the thirty-one instruments offered in evidence by the contestant and the proponents, there are certain noticeable facts concerning them. One is that the contestant's exhibits, with three exceptions, range from a date fifteen months prior to the injury of the deceased to as early as the year 1913. One of the three exceptions is a copy of a purported order for a telephone, dated February 10, 1919, about seven months after his injury and the purported execution of the will. The other two were notes signed by Kincaid, one dated October 26, 1918, and another December 4, 1918, approximately three and four months, respectively, after the date of the will. The exhibits for proponents are, with two exceptions, between April 15, 1918, and July 22, 1918, the date of the will. Of the two exceptions, one, a check, was dated February 13, 1918, and the other, an escrow contract, is dated November 17, 1916. It is evident from an examination of these exhibits, all of which are admittedly signed by Kincaid, that at times his signature was very irregular and showed signs of nervousness, while others were in a smooth, flowing hand. The exhibits offered by contestant are all of the latter type, while those near the date of the pur-

ported will are irregular and indicate a nervousness on the part of the writer. It will be remembered that several witnesses testified to Kincaid's drinking and his nervousness about the date of the will. Proponents' exhibit 3 is a note for $500, dated July 12, 1918, and signed by Tom Neely, with an indorsement by Kincaid. The evidence shows that this note was executed by Neely on the day it bears date, and that some days thereafter, in order to negotiate the note at the bank, the signature of Kincaid was secured thereto, bringing the date of that signature near to the date of the purported execution of the will. The similarity between that signature and the signature to the will is most marked, as is the lack of similarity between exhibit 3 and most of the signatures of Kincaid put in evidence by contestant. H. W. Hatfield, an expert witness for contestant, admitted on cross-examination that he had accepted exhibit 3 at his bank as bearing the signature of Kincaid. The signature to the contract for services, given to Crossland & Crossland and signed on the same day the will is claimed to have been executed, is likewise of convincing similarity. The signature to the escrow contract, though made in 1916, is very similar to the signature to the will. With the signature to this contract and the signature to the $500 note, both proven to be genuine, and the signature to the will, before us, a close scrutiny of them forces the conviction that they were all written by the same person.

While this court will not, on controverted questions of fact, overturn the verdict of a jury unless it is satisfied that such verdict is clearly against the weight of the evidence, where we are convinced that such is the case it is the duty of the court to set such verdict aside. (*McGrady* v. *McGrady,* 298 Ill. 129; *McGovern* v. *McGovern,* 282 id. 97; *Frederickson* v. *Carlson,* 267 id. 78; *Hurley* v. *Caldwell,* 244 id. 448.) In the case of *Bradley* v. *Palmer,* 193 Ill. 15, it was said: "Manifestly, it was never said by this court, nor intended that it should be understood, that

the court will not interfere with a verdict in a case of this kind [will contest] on the ground that it is clearly against the weight of the evidence, where the evidence is conflicting, unless the evidence of the successful party, standing alone and considered by itself, is insufficient to sustain the decree. * * * The rule * * * is clearly subject to the qualification usually stated in the cases, that the verdict is not clearly against the weight of the evidence."

The contention of the appellants that this is the will of Robert E. Kincaid is also supported by the fact that the will disposes of his property in the manner in which he indicated to numerous friends he would dispose of it. There is nothing in the record tending to indicate any relationship on the part of Crossland to the beneficiaries under this will, from which it might be inferred that they had procured the making of this will. Crossland testified that he did not know either Roy or Harry Kincaid, and this is not disputed. There is no showing of any motive on the part of Crossland or Chandler to forge this will or to testify falsely, and we are of the opinion that on this record the verdict of the jury should be set aside and a new trial awarded.

Appellants also complain of errors in the admission of testimony and in instructions to the jury. We have examined the instructions and the record with reference to the alleged errors in ruling on the admission of testimony and find no reversible error therein. The chief objection of appellants to the instructions offered has to do with the rule as to the burden of proof. This rule is clearly laid down in *Donovan* v. *St. Joseph's Home,* 295 Ill. 125, where the cases pertaining to the matter have been reviewed. It is there shown that the term "burden of proof" has two distinct meanings; that generally the burden of proof in the sense of producing evidence passes from party to party as the case progresses, while the burden of proof in the sense of the obligation to establish the truth of the claim by a

303–15

preponderance of the evidence rests throughout upon the party asserting the affirmative of the issue, and that in the contest of a will the burden of proof is on the proponent to prove the will. There was no reversible error in the giving of the instructions.

For the error herein referred to and discussed the decree must be reversed and the cause remanded.

*Reversed and remanded.*